IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

VIJAY PARCHARNE, RENUKA PARCHARNE,                                    PLAINTIFFS
ROHINI NATHAN, SWAMI NATHAN, and
KARUNA NATHAN

V.                                                    CIVIL ACTION NO. 1:21-CV-115-SA-DAS

DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, in his Official Capacity,
Secretary of Homeland Security; TRACY RENAUD,
in her Official Capacity, Acting Director,
UNITED STATES CITIZENSHIP AND IMMIGRATION
SERVICES; DAVID ROARK, in his Official Capacity
as Director of the USCIS TEXAS SERVICE CENTER; and
GERALD HEINAUR, in his Official Capacity as
Director of the USCIS NEBRASKA SERVICE CENTER                          DEFENDANTS

ORDER AND MEMORANDUM OPINION

The Plaintiffs initiated this action by filing their Complaint [1] on July 15, 2021.[1] In their

Complaint [1], the Plaintiffs raise claims for violations of the Administrative Procedures Act,

request a writ of mandamus, and seek declaratory judgment relief and injunctive relief. On August

12, 2021, the Plaintiffs filed a Motion [6], requesting that the Court hold an emergency hearing

regarding the relief sought in their Complaint [1]. The Court initially held a hearing on August 31,

2021, and then held a supplemental hearing on September 7, 2021. Having reviewed the Motion

[6], evidence, argument of counsel, and relevant authorities, the Court is now prepared to rule.

*Factual Background*

There are five plaintiffs in this case, each of whom were born in India. The chart below

provides a brief explanation of each Plaintiffs' immigration status:

---

[1] When the Plaintiffs first filed their Complaint [1], Sudheer Tangella and Sarisha Tippani were also listed
as Plaintiffs. However, Tangella and Tippani voluntarily dismissed their claims and are no longer parties
in this action. *See* [11].

| Name | Location | Status | Date of First Immigration Filing |
|---|---|---|---|
| Vijay Pacharne | Starkville, MS | H-1B Specialty Occupation Worker visa | July 31, 2013 |
| Reunka Pacharne | Starkville, MS | H-4 Dependent (wife of Vijay Pacharne) | July 31, 2013[2] |
| Rohini Nathan | Kingsport, TN | H-1B Specialty Occupation Worker visa | July 26, 2012 |
| Swami Nathan | Kingsport, TN | H-4 Dependent (husband of Rohini Nathan) | July 26, 2012 |
| Karuna Nathan | Kingsport, TN | H-4 Dependent (minor daughter of Rohini Nathan) | July 26, 2012 |

**Vijay Pacharne:** Vijay Pacharne resides in Starkville, Oktibbeha County, Mississippi. He is a secondary school mathematics teacher in the Starkville Oktibbeha Consolidated School District. The school district has supported his permanent residence case, first filing an immigration case for Mr. Pacharne on July 31, 2013. Mr. Pacharne's current immigration status is that of an H-1B Specialty Occupation Worker. Since that time, Mr. Pacharne has been waiting to obtain permanent residence. Mr. Pacharne filed an Application for Adjustment of Status to Lawful Permanent Residence on October 22, 2020 with the USCIS Texas Service Center.

**Reunka Pacharne:** Reunka Pacharne is Vijay Pacharne's wife and also resides in Starkville, Oktibbeha County, Mississippi. Her marriage to Mr. Pacharne makes her eligible to immigrate to the United States as a permanent resident. Her current immigration status is that of an H-4 dependent. Renuka Pacharne filed an Application for Adjustment of Status to Lawful Permanent Residence on October 22, 2020 with the USCIS Texas Service Center.

**Rohini Nathan:** Rohini Nathan resides in Kingsport, Sullivan County, Tennessee. She currently has an H-1B Specialty Occupation Worker visa. Her employer first filed her immigration

---

[2] Reunka Pacharne is a dependent of her husband. As such, her priority filing date is the same as that of her husband. Likewise, Swami Nathan and Karuna Nathan will have the same priority filing date as Rohini Nathan since they filed as dependents of Rohini Nathan.

case on July 26, 2012. She filed an Application for Adjustment of Status to Lawful Permanent Residence on November 20, 2020 with the Nebraska Service Center.

**Swami Nathan:** Swami Nathan is Rohini Nathan's husband. He resides in Kingsport, Sullivan County, Tennessee. His marriage to Dr. Nathan makes him eligible to immigrate to the United States as a permanent resident. His current immigration status is that of an H-4 dependent. He filed an Application for Adjustment of Status to Lawful Permanent Residence on November 20, 2020 with the Nebraska Service Center.

**Karuna Nathan:** Karuna Nathan is Rohini Nathan's minor daughter. As such, she also resides in Kingsport, Sullivan County, Tennessee. As Dr. Nathan's dependent child, she is eligible to immigrate to the United States as a permanent resident. Her current immigration status is that of an H-4 dependent. She filed an Application for Adjustment of Status to Lawful Permanent Residence on November 20, 2020 with the Nebraska Service Center.

*Explanation of Visa Allocation[3]*

The most current Filing Charts list January 1, 2014 as the priority date for applicants from India. As a result, any cases wherein the initial immigration case was filed before January of 2014 are to take priority. Therefore, all the Plaintiffs in this case have priority as they filed their initial immigration cases in 2012 and 2013 respectively.

The Immigration and Nationality Act establishes that there are 140,000 total available employment-based visas every October, the beginning of each fiscal year. It should additionally be noted that statutorily, only seven percent of the total number of visas issued may be for residents of any one country. As a result, immigrants from more populated countries—such as the Plaintiffs

---

[3] The Court notes that the factual background in this case is not disputed. Likewise, the Court notes that at the hearings in this matter, the parties essentially agreed as to how the types of visas pertinent to this case are allocated.

who are from India—seeking to immigrate to the United States tend to experience a "backlog" as they are bound by the initial limits of the total number of visas that may be allocated plus the additional seven percent limitation.

Any of the visas that are not issued from the family-based category from the previous fiscal year roll over to the employment-based category to allow for more than 140,000 visas to be issued in that category. In other words, if there are unused family-based visas issued in the previous year, the unused number is added to the 140,000 employment-based visa allocation the next fiscal year. According to the Defendants, these roll-over visas are subject to the seven percent limit unless there are more available visas in a particular category than there are applications. *See* [24], Ex. 1 at p. 2. However, according to a declaration the Defendants provided, if there are any remaining visas at the end of the year in the employment-based category, those remaining visas will then roll over to the family-based category for the next year. *See* [24], Ex. 1 at p. 3 ("At the end of the fiscal year, the unused EB visa numbers, if any, are required by statute to roll over and are included in the calculation of the subsequent fiscal year's family-sponsored limit.").[4]

As noted above, the Plaintiffs seek employment-based visas. Although any excess family-based visas would theoretically roll over to the employment-based category, typically all family-based visas are used, leaving no remaining family-based visas to roll over to the employment-based category. However, the Plaintiffs contend that last fiscal year (October 2019 – September 2020) all family-based visas were not allocated due to the unique circumstances created by the COVID-19 pandemic. Consequently, approximately 122,000 visas spilled over from the family-based category into the employment-based category. Thus, the Plaintiffs contend that the current

---

[4] As further explained hereafter, the Plaintiffs argue that the remaining visas will expire altogether.

4

fiscal year (which expires on September 30, 2021) is their best opportunity to obtain employment-based visas.

However, they allege that, because of USCIS's inefficiencies, there is no way that the agency will issue all employment-based visas that are available this fiscal year. In fact, as of now, it is estimated that over 82,000 employment-based visas will go unused. *See* [27] at p. 3 ("According to USCIS' own estimation, they will fall short and will be unable to process in excess of 82,000 otherwise available employment-based visas from Fiscal Year 2021."). Furthermore, the Plaintiffs contend that the unused employment-based visas for this fiscal year will be wasted, and it will likely be several more years before their applications are processed.

*Injunctive Relief Standard*

In order to obtain a preliminary injunction, the Plaintiffs must show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat that failure to grant the injunction will result in irreparable injury, (3) the threatened injury outweighs any damage that the injunction may cause the opposing party, and (4) the injunction will not disserve the public interest." *K & J Enterprises, LLC v. City of Oxford, Mississippi*, 2018 WL 4937062, at *3 (N.D. Miss. Oct. 11, 2018) (citing *Neal v. Fed. Bureau of Prisons*, 76 Fed. Appx. 543, 545 (5th Cir. 2003) (internal citation omitted)). The Plaintiffs must prove all four elements as the "failure to prove any one of them will result in a denial of the motion." *Id*. (quoting *Neal*, 76 Fed. Appx. at 545 (internal citation omitted)). Factors three and four "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L.Ed.2d 550 (2009). Further, injunctive relief is an extraordinary remedy not often granted. *See Martinez v. Mathapathi*, 2018 WL 3763848, at *1 (N.D. Tex. July 17, 2018) (internal citation omitted) ("Injunctive relief is an extraordinary remedy that requires the applicant to unequivocally show the need for its issuance."); *see also White v.*

*Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (internal citation and quotation marks omitted) ("A preliminary injunction is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion.").

### Discussion

As noted above, the Plaintiffs bear the burden of establishing each of the four injunctive relief elements. *See, e.g., K & J Enterprises, LLC*, 2018 WL 4937062 at *3 (internal citation omitted). The Court will address each element in turn.

I.      Substantial likelihood of success on the merits

The Plaintiffs allege that the Defendants have unreasonably delayed in processing their I-485 applications and request mandamus relief. The Defendants oppose this characterization and assert that the Plaintiffs have not experienced an unreasonable delay.

"The APA imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it within a reasonable time, and authorizes a reviewing court to compel agency action unlawfully withheld or unreasonably delayed." *Palakuru v. Renaud*, --- F.Supp.3d ---, 2021 WL 674162, at *2 (D.D.C. Feb. 22, 2021) (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003); (quoting 5 U.S.C. §§ 555(b), 706(1)) (internal quotation marks omitted). "The D.C. Circuit has emphasized that 'resolution of a claim of unreasonable delay is ordinarily a complicated and nuanced task requiring consideration of the particular facts and circumstances before the court.'" *Id*. (quoting *Mashpee*, 336 F.3d at 1100).[5]

---

[5] At the outset, the Court notes that the analysis set forth below, while an assessment of the merits, is essentially a determination as to jurisdiction. The District Court for the Northern District of Texas explained this distinction. *See Chuttani v. USCIS*, 2020 WL 7225995, at *2 (N.D. Tex. Dec. 8, 2020) (on appeal) ("The [APA] gives any 'person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute' the right to judicial review . . . If the Court finds that the plaintiffs have not shown any unreasonable delay . . . in adjudication of their visa

The Plaintiffs take the position that USCIS has unreasonably delayed in failing to timely process their I-485 applications which have been pending since October 22, 2020 for the Pacharnes (approximately 11 months) and since November 20, 2020 for the Nathans (approximately 10 months).[6] The Plaintiffs aver that if USCIS fails to adjudicate their applications prior to the end of the fiscal year (September 30, 2021), the visas that spilled over from the family-based category will expire. The Plaintiffs point to 8 U.S.C. § 1152(a)(5)(A) which reads as follows:

**(5) Rules for employment-based immigrants**

**(A) Employment-based immigrants not subject to per country limitation if additional visas available**

If the total number of visas available under paragraph (1), (2), (3), (4), or (5) of section 1153(b) of this title for a calendar quarter exceeds the number of qualified immigrants who may otherwise be issued such visas, the visas made available under that paragraph shall be issued without regard to the numerical limitation under paragraph (2) of this subsection during the remainder of the calendar quarter.

8 U.S.C. § 1152(a)(5)(A). The Plaintiffs argue that the additional 122,000 visas that spilled over from the family-based category from the previous fiscal year are therefore not subject to the seven percent limitation and create a unique opportunity to reduce the number of applications in the backlog for applicants from countries such as India and China. Of most importance to this Court,

---

applications—i.e., if they have not stated a claim—then they have suffered no legal wrong for which federal law waives sovereign immunity and the Court lacks jurisdiction. Strange as it is then, the Court must therefore engage with the merits of the plaintiffs' claims at the jurisdictional stage." *Id*. (citations omitted). Although this is essentially a distinction without a difference (since the Court will still address the merits), the Court nevertheless feels compelled to explain the distinction.

[6] The Court notes that Dr. Nathan's I-140 application, which must be processed prior to the adjudication of her I-485 application, is still pending. However, the Plaintiffs' attorney noted at the hearing on September 7, 2021 that the I-140 application and the I-485 application can be processed simultaneously. The Defendants did not dispute this contention.

however, is the fact that, at least according to the Plaintiffs, if these 122,000 visas are not issued this fiscal year, they will not roll back over to the family-based category and will essentially be wasted. On that point, at the August 31 hearing, defense counsel took the position that, based on information their clients provided to them, the visas would likely not be wasted. However, defense counsel specifically stated that a definitive representation could not be made to the Court on that issue.

In light of their position that the visas will be wasted, the Plaintiffs request that the Court order USCIS to adjudicate their applications prior to the end of the fiscal year. Alternatively, they request that the Court order USCIS to reserve visa numbers for them from the spillover category.

As a general matter, "[u]nder 8 U.S.C. § 1255, the Attorney General may adjust an alien's status to that of a lawful permanent resident if the alien applies for such an adjustment and is eligible for a visa, and if a visa is available to him at the time his application is filed." *Paunescu v. I.N.S.*, 76 F.Supp.2d 896, 900 (N.D. Ill. 1999).

In order to analyze whether an agency has unreasonably delayed, courts typically use the six factors set out in *Telecommunications Research & Action Center v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984). Here, both parties agree that the *TRAC* factors are applicable. This Court recognizes, as have other courts, that while the *TRAC* factors are pertinent to the analysis, the particular facts of a case will largely determine whether the delay has been unreasonable in processing immigration applications. *Kolluri v. United States Citizenship and Immigration Service*, 2021 WL 183316, at *4 (N.D. Tex. Jan. 17, 2021) (slip copy) (quoting *Ahmadi v. Chertoff*, 522 F.Supp.2d 816, 822 (N.D. Tex. 2007)); *see Yu v. Brown*, 36 F.Supp.2d 922, 935 (D. N.M. 1999) (citing *Fraga v. Smith*, 607 F.Supp. 517, 522 (D. Or. 1985) ("What constitutes an unreasonable delay in the

context of immigration applications depends to a great extent on the facts of the particular case.")).

These factors are as follows:

> (1)    The time agencies take to make decisions must be governed by a "rule of reason;"
>
> (2)    Where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3)    Delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4)    The court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
>
> (5)    The court should also take into account the nature and extent to the interests prejudiced by delay; and
>
> (6)    The court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC*, 750 F.2d at 80 (internal citations and quotations omitted); *see Ensco Offshore Co. v. Salazar*, 781 F.Supp.2d 332, 337 (E.D. La. 2011) (internal citations omitted) ("Of these factors, the first is the 'most important.' . . . What follows from these thoughts is that a timetable need not be express for federal courts to find agency delay to be unreasonable."); *Kolluri*, 2021 WL 183316 at *7 (internal citation omitted) ("Although Plaintiffs have demonstrated that 'human health and welfare are at stake,' the bulk of the *TRAC* factors weighs in favor of USCIS. Because Plaintiffs have failed to meet their burden in showing that their claims are likely to succeed on their merits, the 'most important factor,' . . . the Court denies Plaintiffs' motion for a preliminary injunction."); *see also Parcha v. Cuccinelli*, 2020 WL 607103, at *14 (E.D. Tex. Feb. 7, 2020) (slip copy) ("The determination of unreasonable delay in agency action is guided by a six-part test . . ."); *M.J.L. v.*

*McAleenan*, 420 F. Supp. 3d 588, 597 (W.D. Tex. 2019) ("In assessing claims of agency delay under § 555(b) of the APA, courts apply the six-factor test first articulated in [*TRAC*], . . ."). The Court will address each of these factors in turn.

　　　　　　*a. The time agencies take to make decisions must be governed by a "rule of reason."*

"The first two *TRAC* factors relate to the time agencies take to make decisions and whether such timetable has been provided by Congress." *Kolluri*, 2021 WL 183316 at *5. Here, the parties agree that USCIS generally processes applications on a first-in, first-out basis. Several courts have found that a first-in, first-out basis for adjudication is appropriate. *See id.* (internal citation omitted) ("The Court agrees with the case law in which federal courts have held that USCIS operates under a first-in, first-out method of adjudication that constitutes a 'rule of reason' and satisfies the first *TRAC* factor."); *see also Muvvala v. Wolf*, 2020 WL 5748104, at *3 (D.D.C. Sept. 25, 2020) (slip copy) (internal citations omitted) ("Other federal courts have held that this first-in, first-out method of adjudication constitutes a 'rule of reason' and satisfies the first *TRAC* factor. . . The Court agrees that the time it takes for USCIS to adjudicate H-4 and EAD applications is governed by a rule of reason and an 'identifiable rationale.'"). This Court sees no reason to depart from the logic which various other courts have applied when considering this topic, particularly in light of the fact that the Plaintiffs have raised no argument that the first-in, first-out basis is in and of itself unreasonable. The Court therefore finds that this factor weighs in the Defendants' favor.

　　　　　　*b. Where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason.*

As to the timetable provided by Congress, the pertinent statutory language provides: "It is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application[.]" 8 U.S.C. § 1571(b).

While some courts have held that this statute provides a meaningful standard, courts have overwhelmingly interpreted it to not be a hard deadline. *See Bian v. Clinton*, 605 F.3d 249, 255 (5th Cir. 2010) (vacated on other grounds) (internal citation omitted) ("We do not agree that [8 U.S.C. § 1571(b)], which merely expresses Congress's sense of the adjudicative process, establishes that [the plaintiff] has a 'clear and certain' right to have her I-485 application adjudicated within 180 days of its filing—or that the USCIS has a 'plainly prescribed' duty to process the application within that time frame."); *see also Abbasfar v. Chertoff*, 2007 WL 2409538, at *3 (N.D. Cal. Aug. 21, 2007) (internal citation omitted) ("[T]here is a meaningful standard against which to judge the agency action and there is jurisdiction for this claim under the APA."); *Kolluri*, 2021 WL 183316 at *5 (internal citation omitted) ("[T]he Court declines to adopt Plaintiffs' claim that '[a]ny delay beyond 180 days should be presumptively and *per se* unreasonable.' Doing so would 'transmogrify an aspiration into a deadline.'").

Here, there is no dispute that the Plaintiffs' applications have been pending for more than 180 days. Likewise, there is no dispute that both the Texas Service Center and the Nebraska Service Center have on average, over the past several years, been processing applications at a slower rate than this 180-day time frame.[7] Specifically, as of August 2021, the average processing time for an application at the Texas Service Center was 24.5 to 62.5 months,[8] and the average processing time for an application at the Nebraska Service Center was 11 to 23 months. *See* [16], Ex. 1 at p. 2; Ex. 3 at p. 2.

---

[7] As was mentioned above, the Pacharnes' applications are pending at the Texas Service Center, and the Nathans' applications are pending at the Nebraska Service Center.

[8] According to the Affidavit of Eduardo Martinez, who holds the position of the USCIS Texas Service Center's Associate Center Director of the Humanitarian and Employment Adjustment Team, the processing times at the Texas Service Center were expected to decrease to 9.5 to 21.5 months in its September 2021 post. *See* [16], Ex. 1 at p. 3.

Despite recognizing that the 180-day deadline has not been strictly adhered to in the processing of the Plaintiffs' applications, the Court finds that the 180-day deadline should not be viewed as a hard and fast rule. Rather, the Court adopts the reasoning of the *Verma* court, which held that the statutory language indicates that it was intended to be merely instructive, rather than mandatory. *Verma v. U.S. Citizenship and Immigration Services*, 2020 WL 7495286, at *7 (D.D.C. Dec. 18, 2020) (slip copy) (internal citations omitted) ("The Court agrees with *Ray* and *Nibber*: although Congress did not *mandate* that USCIS adjudicate petitions within six months' time, it expressly *endorsed* that timeline. . . To be sure, that sense of the Congress does not carry as much weight as would a statutory deadline, but it still carries some weight in the overall balance.") (emphasis in original). The Court is certainly cognizant of the statutory language and considers the 180-day time period set forth therein to carry *some* weight.

As noted above, the Pacharnes filed their Applications for Adjustment of Status in October 2020, and the Nathans filed their Applications in November 2020. As such, both the Pacharnes' and Nathans' applications have been pending for more than 180 days. Although not treating the 180-day deadline as a hard deadline, the Court, again, does find that it carries *some* weight. As a result, the Plaintiffs argue, and the Defendants conceded at the hearing, that this prong, to the extent the 180-day deadline is applicable, weighs in the Plaintiffs' favor.

        c. *Delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake.*

The Plaintiffs make multiple arguments to support their contention that their health and welfare are at stake as they wait to receive their permanent residency status. First, while the Plaintiffs concede that they have been granted travel and work authorizations as they are awaiting the adjudication of their applications, the Plaintiffs point out that these authorizations are still limited as long as they are waiting on their I-485s to be processed. The Defendants argue that while

the Plaintiffs are subject to various restrictions even with their employment and travel authorizations, these are not matters that put the Plaintiffs' health and welfare at stake. The Defendants point out that the Plaintiffs can still make a livable wage, have *some* flexibility to change their employment, and have the availability to travel internationally. The Court heard testimony on this issue at the August 31 hearing when Mr. Pacharne explained that, while he is able to work as a high school teacher, he is subject to certain limitations as to the jobs he can accept.

For example, Mr. Pacharne testified that he had previously applied for a job as a professor at a community college. After interviewing for the position, Mr. Pacharne was selected to fill the role. However, Mr. Pacharne would have needed to resign from his current job as a teacher at Starkville High School (a subordinate of his sponsor Oktibbeha Consolidated School District for his I-140 form) before taking the job at the community college. The community college professor position, although technically within the parameters of the employment restrictions he faces while waiting for his I-485 to be processed, would have required him to receive new I-140 sponsorship. As a result, were Mr. Pacharne to take the position, he would have lost his sponsorship from the Starkville Oktibbeha Consolidated School District, would have to get the community college to be his new sponsor for a new I-140 form, would have lost his place (and consequently his wife's place) in the queue, and would have had a new priority date from a later year—putting him years further back in line. Clearly, these employment restrictions, despite providing some flexibility, have not given the Plaintiffs reprieve from harm.

While the Court acknowledges the Defendants' arguments that the Plaintiffs have some flexibility as they wait to become legal permanent residents, such flexibility does not remove all

harm to the Plaintiffs' health and welfare. As a result, the Court finds that this factor, at least to some extent, weighs in the Plaintiffs' favor.

       *d. The court should consider the effect of expediting delayed action on agency activities of a higher or competing priority.*

       The Defendants argue that by granting the relief the Plaintiffs request, the Court would not be resolving an issue but would rather be rearranging the visa queue. In other words, the Defendants aver that should the Court grant the Plaintiffs' request, it will only be disrupting the first-in, first-out rule of reason and will lengthen the wait time for other individuals who are ahead of the Plaintiffs in the queue. This would effectively be prioritizing the Plaintiffs' cases over the cases of others. The Court certainly acknowledges the length of the queue of applicants waiting for the I-485 forms to be processed.[9] In fact, other courts have previously denied similar requests to prevent applicants from jumping ahead in the queue. *See Kolluri*, 2021 WL 183316 at *6 (internal citation omitted) ("Because granting Plaintiffs relief only harms other applicants, the Court determines that the fourth *TRAC* factor weighs in USCIS's favor."); *see also Fangfang Xu v. Cissna*, 434 F.Supp.3d 43, 55 (S.D.N.Y. 2020) ("The effect of leapfrogging Plaintiff's application to the front of the line would do nothing to cure the deficiencies of the asylum application process; it would only harm other applicants, who are equally deserving of prompt adjudication."); *L.M. v. Johnson*, 150 F.Supp.3d 202, 213 (E.D.N.Y. 2015) (quoting *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003)) ("The D.C. Circuit has further found it is appropriate to 'refuse [] to grant relief, even though all the other factors considered in *TRAC* favor [] it, where a judicial order putting [the plaintiff] at the head of

---

[9] In his Affidavit, Martinez stated that about 55,000 people filed their I-485 applications before the Pacharnes filed their I-485 applications. *See* [16], Ex. 1 at p. 2. Likewise, in his Affidavit, Brian Lutz, the USCIS Nebraska Service Center's Associate Center Director of the Employment Division stated that 20,284 I-485 Applications were filed before the Nathans filed their employment-based I-485 Applications. *See* [16], Ex. 2 at p. 2.

the queue would simply move all others back one space and produce no net gain.'"); *Xu v. Nielsen*, 2018 WL 2451202, at *2 (E.D.N.Y. May 31, 2018) ("There are many other applicants who have waited even longer than plaintiff; to grant [the plaintiff] priority is to push them further back in line when the only difference between them is that plaintiff has brought a federal lawsuit.").

However, the Court finds the case *sub judice* distinguishable from those cases. Specifically, the Court is struck by the circumstances the Plaintiffs face. The Plaintiffs are not simply requesting to jump ahead in line. They are requesting that these additional 122,000 visas, 82,000 of which have yet to be issued, not be wasted but rather be applied to help decrease the size of the backlog for Indian and Chinese applicants.

The Defendants have pointed out that there is likely to be an even greater spillover for the 2022 fiscal year and that, as a result, the Plaintiffs do not need to jump ahead in line to receive one of the visas available for the 2021 fiscal year. However, this Court finds it unreasonable to deny the Plaintiffs' request on the grounds that another spillover may occur when a significant spillover has already occurred but, due to a lack of processing applications, the spillover has conferred very little benefit to the thousands of applicants stuck in the backlogs. Nevertheless, the Court acknowledges the parties' competing interests under this prong and finds that it does not weigh heavily in favor of either party.

> e. *The court should also take into account the nature and extent to the interests prejudiced by delay.*

The Plaintiffs have put forth evidence that they are eager to receive their legal permanent residencies and the benefits that come with that status. Certainly, the parties addressed some of the Court's major concerns at the hearing on September 7.[10] However, the Court is still well aware of

---

[10] Prior to the hearing, the Court was primarily concerned about the possibility that the Nathans' daughter would age out before her Application for Adjustment of Status was processed. However, the defense counsel explained at the hearing, and the Plaintiffs' counsel agreed, that the Immigration and Nationality

the prejudicial treatment the Plaintiffs may experience if their applications are not processed by the end of the fiscal year.

The Plaintiffs also make the argument that if their applications are not processed by the end of the fiscal year, it could be years before their applications are processed because there is a chance the priority dates will regress for the 2022 fiscal year and beyond. On September 14, 2021, Barry Walker, one of the Plaintiffs' attorneys, filed a declaration [27] in which he updated the Court on the newest priority date issued in the October 2021 Visa Bulletin. In that Bulletin, the priority date for EB3 visa applicants remained unchanged from the January 1, 2014 priority date listed in the September Bulletin. [27] at p. 1. In the declaration, Walker went on to point out the Bulletin's prediction for November which states that the priority date for the EB3 category for applicants from India could regress. *Id*. at p. 1-2 (quoting [27], Ex. 1 at p. 11).

Additionally, and perhaps most troubling to the Court, is the setback the Plaintiffs will experience in applying for their citizenship should USCIS not process the Plaintiffs' applications before the September 30 deadline and the priority date later regresses. At the hearing, the Plaintiffs asserted that they intended to ultimately become United States citizens and that, in order to do so, they must first obtain their green cards and then remain in the United States for five years in order to be eligible to become a citizen of the United States. If the priority date regresses and the Plaintiffs are required to re-apply for an adjustment of status, then they will be that much further from realizing their ultimate goals of obtaining citizenship. The Court notes how this harms the Plaintiffs. While the priority dates could stay the same or improve, the Court cannot ignore the

---

Act § 204(k) protects the Nathans' daughter from aging out. The provision reads as follows: "Regardless of whether a petition is converted under this subsection or not, if an unmarried son or daughter described in this subsection was assigned a priority date with respect to such petition before such naturalization, he or she may maintain that priority date." 8 U.S.C. § 1154(k)(3). Essentially, the statute provides that the Nathans' minor daughter will not age out of the application process because her age was locked in at the time they were assigned a priority date.

prejudice the Plaintiffs could face if the priority dates regress. As a result, the Court finds that this prong weighs in the Plaintiffs' favor.

### f. The court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

"[A] delay that is the result of bad faith—that is, a delay for improper reasons—is a delay that is *per se* unreasonable. . . ." *Tummino v. Von Eschenbach*, 427 F.Supp.2d 212, 231 (E.D.N.Y. 2006). "To find that an agency acted in bad faith, however, a party must present evidence 'of bad faith or impropriety driving the delay in adjudication' of the relevant applications." *Ray v. Cuccinelli*, 2020 WL 6462398, at *11 (N.D. Cal. Nov. 3, 2020) (slip copy) (internal citations omitted). Here, the Plaintiffs have not made an argument either at the hearing or in their briefing that USCIS has acted in bad faith. Rather, they have focused primarily on the Defendants' alleged unreasonable delay. As a result, the Court sees no need to further address this prong.

### g. Additional pertinent facts and circumstances of this case

The Court notes that, for the most part, the *TRAC* factors weigh in the Plaintiffs' favor. However, the Court also recognizes that the *TRAC* factors are not ironclad and that the Court can look to the specific circumstances of the case. *TRAC*, 750 F.2d at 80 ("Although the standard is hardly ironclad, and sometimes suffers from vagueness, it nevertheless provides useful guidance in assessing claims of agency delay. . ."); *see also Kolluri*, 2021 WL 183316 at *4 (quoting *Ahmadi*, 522 F.Supp.2d at 822) ("The Court notes that '[w]hat constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case.'").

The Court finds that the specific facts of this case require it to take further considerations into account. Throughout the hearings held in this case, the Plaintiffs emphasized that, due to the specific rare circumstances applicable here—particularly, the significant number of spillover

visas—the Court should rule in their favor. Certainly, courts have considered processing delays in other cases and have found that delays longer than the time the Plaintiffs have waited (ten months and eleven months, respectively) are unreasonable. *See Bousanna v. Johnson*, 2015 WL 3651329, at *8 (S.D.N.Y. June 11, 2015 (quoting *Islam v. Heinauer*, 32 F.Supp.3d 1063, 1071-72) (N.D. Cal. 2014) (collecting cases) (internal citations omitted)) ("Although 'courts have generally found delays of four years or less not to be unreasonable[,] . . . many courts applying the *TRAC* factors have declined to find that delays exceeding six years are reasonable.'"); *see also Espin v. Gantner*, 381 F.Supp.2d 261, 266 (S.D.N.Y. 2005) (internal citations omitted) ("Although [the plaintiff] appears to contend that the length of time that her adjustment application has been pending [three years] indicates there has been an unreasonable delay . . . the Supreme Court has held that evidence of the passage of time cannot, standing alone, support such a claim."). However, the Court has been unable to locate any cases in which a court addressed a scenario such as the case at bar— specifically, where such a significant surplus of visas exist.

The Court acknowledges that the processing centers have been subject to the delays and challenges the pandemic has presented. The Defendants have provided a declaration from Andrew Parker, the Branch Chief of the USCIS's Office of Policy and Strategy's Residence and Admissibility Branch. *See* [24], Ex. 1. In his declaration, Parker lists a number of steps the USCIS has taken to assist in the visa adjudication process for the 2021 fiscal year. Some of these steps include "[p]rovid[ing] overtime and supplemental USCIS staff to the USCIS employees working with its Lockbox intake facilities" and "[p]rovid[ing] overtime funds to USCIS employees processing and adjudicating EB adjustment of status applications." *Id*. at p. 5. Again, the Court notes that the Defendants have not elaborated on the extent of those measures.

As to the operations of USCIS, the Plaintiffs have provided the Court with a copy of a Report the U.S. Government Accountability Office issued regarding "Actions Needed to Address Pending Caseload." *See* [32], Ex. 1. The Report noted that USCIS's median processing times significantly increased for the fiscal years 2015-2020. The Report likewise notes inefficiencies within USCIS during that time period. The Court will note one example of such inefficiencies from the Report:

> USCIS has developed several potential plans to reduce its pending caseload but has not implemented the plans or identified the resources and finding that would be needed to address the pending caseload. For example, the Office of Management and Budget's Budget and Policy Guidance to the Department of Homeland Security for fiscal year 2019 requested that USCIS developed a "backlog reduction plan." In response to this request, USCIS created a separate staffing model for backlog reduction with an accompanying plan, which described the staffing levels that USCIS would need in order to eliminate the backlog by fiscal year 2024. USCIS stated in the plan that it would need to hire an additional 2,177 adjudication and support positions to eliminate the backlog. However, USCIS officials stated that they were unable to implement the plan because USCIS was not financially and structurally poised to hire such a large number of staff, and the plan did not discuss the resources that would be needed to address those challenges.

[32], Ex. 1 at p. 36.

The Court is aware that the Plaintiffs' I-485s were not filed until after the end of fiscal year 2020—thus, after the time period addressed by the Report. While the Court certainly cannot know the full impact that the inefficiencies addressed in the Report had on the Plaintiffs' cases, it seems extremely likely, in this Court's view, that the inefficiencies which created, and did not adequately address, the backlog, has impacted the delay of their cases. This is particularly true in light of the fact that the Plaintiffs' immigration cases were initially filed in 2012 and 2013 respectively.

While the Plaintiffs did not specifically rebut the information contained in Parker's affidavit, the Court does note that the Report does appear to, at least modestly, support the position the Plaintiffs have taken throughout this case.

II.    Substantial threat that failure to grant the injunction will result in irreparable injury

The Plaintiffs argue that they will suffer irreparable harm if they are not granted their legal permanent residencies by the end of this fiscal year. The Court acknowledges the Plaintiffs' plight and the burdens these restrictions have placed on them throughout the application process. Notably, the Pacharnes' oldest daughter turned 21 years old before their applications were far enough along to lock in her age. As a result, she has since moved to Australia where she was able to obtain a green card. Additionally, as was mentioned above, if the priority date regresses before the Plaintiffs' applications are processed, their ultimate goal of becoming United States citizens will be further delayed. Such harm is irreparable as this is time the Plaintiffs will not be able to get back.

The Plaintiffs also argued, and such arguments were analyzed above, that they face employment and travel restrictions with their current visas that they would not face if they were lawful permanent residents. For example, while the Plaintiffs might be able to apply for and accept new jobs, taking these new jobs could interfere with their I-140 sponsorships and thus their places in the queue. As was mentioned above, Mr. Pacharne could not take a job at a community college without completely restarting his application process because taking the job would have required him to restart his I-140 application with the new employer as the sponsor. Therefore, the Plaintiffs argue that they cannot accept more advanced jobs or jobs with greater pay without having to restart their immigration application process. Likewise, the Plaintiffs argue that while they can travel internationally, they are subject to greater travel restrictions upon re-entering the United States

than they would be if they were legal permanent residents.[11] Further still, not only have the Plaintiffs diligently followed the requirements for submitting their I-140 forms and later their I-485 forms, but they have even done more than was required of them to increase the likelihood of having their applications processed in a reasonable time. Specifically, Mr. Pacharne's employer paid $1,225.00 to have each of the Pacharne's cases processed ($2,450.00 total) in the premium process—thus getting a new H-1B transfer in 15 days. Should the Pacharne's I-485 forms not be processed by the end of the fiscal year and, even worse, should the priority date regress before the Plaintiffs' applications are processed, then the money the employer paid to USCIS will, in this Court's view, have been for naught.

Finally, the Plaintiffs argue that if they are not awarded their legal permanent residencies by the end of this fiscal year, then they face the possibility of waiting in the queue for years before being eligible to receive permanent resident visas again. As the Plaintiffs explained, this fiscal year was the first time since they began the application process in 2012 and 2013 that their date of filing has been included in the priority date. As was mentioned above, the Declaration [27] from the Plaintiffs' counsel shows that the October 2021 priority date remains unchanged from the September priority date. However, the Plaintiffs further explain that these priority dates are fluid. Therefore, the priority date could stay the same or even improve in November, but, as the Plaintiffs point out, the Visa Bulletin indicates that the November priority date could regress. *See* [27] at p. 1-2. Although the Plaintiffs would be well within the expected time frames to receive visas at both the Texas Service Center and the Nebraska Service Center in the coming fiscal year, whether their

---

[11] The Plaintiffs' counsel noted at the hearing that if the Pacharnes travel with their youngest daughter who is a citizen of the United States, then they are not subject to as many restrictions upon re-entering the United States because her citizenship affords them more flexibility. However, the Nathans' daughter is not a citizen of the United States. Therefore, they are not exempt from any of the travel restrictions placed on individuals who have not yet received their legal permanent residency.

applications will be processed while they fall within the priority date is uncertain. While the Plaintiffs acknowledged at the hearing that both the Texas Service Center and the Nebraska Service Center have reported increases in the number of applications they have processed throughout this fiscal year, their applications were subject to prolonged processing periods in prior fiscal years. The Court has given serious consideration to the Plaintiffs' arguments and acknowledges the sacrifices they have made since beginning the visa application process. Sacrifices dating all the way back to 2012 and 2013 respectively. Ultimately, those sacrifices involve their families, livelihoods, time, and finances. They have not only been harmful, but they also cannot be undone or remedied—they are irreparable. As a result, this factor weighs in the Plaintiffs' favor.

III.     Threatened Injury and Public Interest

The Court will analyze these last two factors together as factors three and four "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435, 129 S. Ct. 1749. The Defendants argue that the public interest would not be served if the requested relief is granted because granting the Plaintiffs' request for relief would only allow them to skip ahead of other applicants in the queue. As was previously analyzed, this is not necessarily the case. The Plaintiffs would not be jumping in line and taking visas from other applicants. Rather, they are asking this Court to prevent the surplus visas from going to waste. Although the Court recognizes the parties' contentions on these points, the unique circumstances of the significant surplus in this case and the Defendants' unreasonable delay in processing the Plaintiffs' applications tilt this factor in the Plaintiffs' favor.

IV.     Additional Considerations and Further Explanation

After analyzing the four elements required for granting a preliminary injunction, including analyzing all six *TRAC* factors, the Court finds that the evidence weighs in the Plaintiffs' favor

and will order that they be granted relief. However, in doing so, the Court feels compelled to address several other matters.

First, the Court finds it necessary to specifically address the Fifth Circuit's 2010 decision in *Bian v. Clinton*. 605 F.3d 249. There, the Fifth Circuit considered the plaintiff's contention that USCIS had unreasonably delayed in the adjudication of her I-485 application. *Id*. The plaintiff's visa category was EB2 with Chinese chargeability, and her visa priority date was September 29, 2005. *Id*. at 251. However, the then-current cut-off date for applicants in the plaintiff's category was June 1, 2004—more than one year *before* the plaintiff's priority date. *Id*. Thus, the defendants took the position that there was no visa available for the plaintiff and thus "if forced to rule on [the plaintiff's] application, they would have no choice but to deny her request for an adjustment of status." *Id*.

In analyzing her claim, the Fifth Circuit looked to the INA's jurisdiction-stripping statute located at 8 U.S.C. § 1252 and ultimately held:

> Section 1252 expressly exempts from judicial review and "action" that is within the agency's statutory grant of authority. This includes establishing "such regulations as the agency may prescribe" to carry out its statutory duty, such as 8 C.F.R. § 245.2(a)(5)(ii), which specifies that "an application for adjustment of status, as a preference alien, shall not be approved until an immigrant visa number has been allocated by the Department of State. . ." As [the plaintiff] contests the USCIS's decision to adjudicate her application in compliance with regulations that are clearly within the agency's discretion to establish, the federal courts are without jurisdiction to entertain her claim.

*Id*. at 253. However, approximately five months later, the Fifth Circuit entered a *per curiam* order providing as follows:

> IT IS ORDERED that Respondents' motions to dismiss the Petitioner's appeal as moot, to vacate this court's decision in *Bian v. Clinton*, 605 F.3d 249 (5th Cir. 2010), to vacate the judgment of the district court, and to remand to the district court with instruction

> to dismiss as moot is GRANTED. Petitioner's immigrant visa
> number has now become available, and the government has
> adjudicated her application, being the relief she requested at trial.
> For the first time in her reply to the Respondents' motion to dismiss,
> the Petitioner requested the backdating of her adjustment-of-status,
> so this relief is waived.

*Bian v. Clinton*, 2010 WL 3633770, at *1 (5th Cir. 2010).

In considering *Bian*, this Court first notes that the Fifth Circuit specifically vacated its substantive decision, as well as the district court's decision in the case. Furthermore, the Court notes that, though *Bian* involved the adjudication of an I-485 application, it differed in at least one key aspect. As noted above, the cut-off priority date in *Bian* was approximately one year prior to the plaintiff's priority date. This seemed to, at least in part, guide the Fifth Circuit's analysis. The Court finds this distinction to be critical as compared to the case at bar, where the Plaintiffs' priority dates are current *and*, in addition to the September 30 deadline for the expiration of the surplus visas, they run the risk of a regression in November 2021, which would render their petitions to no longer be ripe for adjudication.

Additionally, the Court feels compelled to stress that its ruling today is based upon the specific facts and circumstances of the Plaintiffs' case. *See Kolluri*, 2021 WL 183316 at *4 (quoting *Ahmadi*, 522 F.Supp.2d at 822) ("The court notes that '[w]hat constitutes an unreasonable delay in the context of immigration applications depends to a great extent on the facts of the particular case.'"). Particularly, the Plaintiffs face an extensive backlog which has, at least in part, been created and perpetuated by USCIS' inefficiencies. This backlog has not been significantly reduced over the past several months, despite the fact that there has been a large number of spillover visas from the family-based category. This spillover was unanticipated—largely due to the pandemic—and, according to the parties, is atypical.

The Court's holding should not be interpreted as a finding that a ten or eleven month delay is *per se* unreasonable. In fact, the Court specifically finds that it is not *per se* unreasonable. However, considering the *specific* facts of this case, including but not limited to the fact that approximately 82,000 visas (which the Defendants could not definitively state would not be wasted) will go unused, the Court finds that USCIS's delay in adjudicating the Plaintiffs' applications, which will in turn cause them to miss an opportunity to be removed from the extensive backlog and potentially suffer further delay, is unreasonable.

*Conclusion*

For the reasons stated above, the Court finds that the Plaintiffs have established unreasonable delay on behalf of USCIS. Consequently, the Court has jurisdiction over this matter. The Plaintiff's request for injunctive relief is GRANTED. USCIS is hereby ordered to adjudicate the Plaintiffs' I-485 visas applications prior to the expiration of the 2021 fiscal year. Recognizing the short deadline, if USCIS is unable to do so, the Court orders that USCIS reserve five visas for the Plaintiffs from the visa surplus from the 2021 fiscal year. Should the Defendants fail to comply within a reasonable amount of time, the Court may entertain a Motion from the Plaintiffs. A Judgment consistent with this Order and Memorandum Opinion will be entered this day.

SO ORDERED, this the 30th day of September, 2021.


/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE